THE STATE v. STEWART, *Appellant.*

Division Two, February 1, 1898.

1. **Murder:** WITNESSES: OTHER DEFENDANT. In a murder trial one is a competent witness for the State, notwithstanding there is pending against said witness a separate indictment for the same crime.

2. **Murder:** ACCESSORY BEFORE THE FACT: ERRONEOUS INSTRUCTION. The evidence showed that two defendants, separately indicted, had traveled to within seventy-five yards of the murder, had been together for four hours, and one of them went to a barn and while trying to steal some corn killed the farmer. Under the circumstances this instruction asked by defendant was properly refused: "The jury are instructed that even if they find from the evidence that defendant was near the place where the homicide was committed, yet they can not convict defendant unless they further find that defendant is the man who fired the fatal shot."

3. ———: DEFENSE OF ONE'S PROPERTY. This instruction was also properly refused: "You are further instructed that if from the evidence you find and believe that the deceased, Michael Prendergast, caught the defendant in the act of stealing some corn from his crib and that the said Michael Prendergast, with a loaded shotgun, made an assault on the defendant with the intent then and there to kill the defendant or inflict upon him some great bodily harm, and that while said assault was being made defendant shot and killed said Prendergast, then you will find the defendant not guilty."

4.  ———: NEWLY DISCOVERED EVIDENCE. Newly discovered evidence
mentioned but not set out in the motion for a new trial, being sup-
ported by the affidavit of neither defendant nor the supposed wit-
ness, is not noticed on appeal.

*Appeal from St. Louis County Circuit Court.*—HON.
RUDOLPH HIRZEL, Judge.

AFFIRMED.

*J. R. Claiborne* and *G. N. Fickeissen* for appellant.

*Edward C. Crow*, Attorney-General, and *Sam B.
Jeffries*, Assistant Attorney-General, for the State.

(1)   The defendant having been convicted of mur-
der in the second degree, it is unnecessary to present
either argument or authority in support of instructions
given on murder in the first degree, or as to the suf-
ficiency of the indictment on that question. *State v.
Kelley*, 85 Mo. 143; *State v. Williams*, 68 Mo. 110. (2)
No error was committed by the court in refusing de-
fendant's instructions.   They do not contain correct
propositions of law as applicable to the evidence in this
case.  Besides, the court had previously instructed upon
every conceivable question growing out of the issues
made by reason of the indictment and defendant's plea
of not guilty, as well as the testimony introduced.  (3)
Defendant objected to testimony of witness Walter
Black, who is under indictment for the same offense,
though the indictment is separate from that upon
which defendant was tried.   We do not deny that
should a joint indictment have been found against
Black and this defendant, that Black would not be a
competent witness for the State until his case had been
properly disposed of, or section 4217, Revised Statutes
1889, had been fully complied with and satisfied.   De-
fendant and witness Black were not codefendants to

the same indictment. They were separately indicted, though for the same offense. Bishop's Crim. Proc., sec. 1020; *U. S. v. Henry*, 4 Wash. C. C. Rep. 428; *Comm. v. Bosworth*, 22 Pick. 397; *State v. Watson*, 31 Mo. 361; Chitty's Crim. Law, sec. 602; Best on Ev., secs. 171, 173; *State v. Chyo Chiagk*, 92 Mo. 395; *State v. Harkins*, 100 Mo. 672; *State v. Walker*, 98 Mo. 95; Wharton's Crim. Ev., sec. 439; *McKensie v. State*, 24 Ark. 639.

SHERWOOD, J.—Prosecution for murder, conviction of the second degree of that offense, with punishment assessed at imprisonment in the penitentiary for the term of ninety-nine years. A sufficiently full narration of the facts disclosed in evidence is the following:

.On the evening of the fifth day of May, 1897, the defendant and one Walter Black, driving a light spring wagon of the defendant's, which contained the sacks that were afterward found filled with corn in the crib of the deceased, drawn by two horses, one belonging to defendant and the other to Walter Black, went to the home of a negro man known as Costly Black, about three miles distant and about one mile from the home of the deceased. Costly Black was a relative of Walter Black. They reached their place of destination at about 8 o'clock of that evening and remained there until about 11 o'clock, in the meantime being engaged in a game of dominos with several members of the Black family. On their way home, and until they got within a short distance of the deceased Prendergast's house, they drove leisurely along, when, according to the evidence of Walter Black, the defendant ordered him to stop, and defendant got out of the wagon and went across the field in a westerly direction toward the home of Mr. Prendergast. He had been gone about fifteen or twenty minutes, when he returned to the wagon and

requested the witness to drive on.   While the defendant
was gone the witness heard what sounded to him like
two double shots, and appeared to have been fired
somewhere near or about the deceased's house.   In a
very few minutes after the shooting took place the de-
fendant returned to where the witness had stopped the
team and was waiting for him, perhaps seventy-five or
eighty yards distant from the house.   When defendant
told the witness the second time to drive on, witness
asked defendant what was the matter.   This question
he repeated two or three times, but received no answer.
Afterward the question was again repeated and de-
fendant told him that he had shot Mr. Prendergast
upon that night, stating to witness in answer to the
question as to why he shot him, defendant said:   "I
could not help it."   Before leaving the wagon defend-
ant borrowed a knife from witness Black, which he left
in the corn crib, and which was afterward found there
and introduced in evidence during the trial of the case.
On returning to the wagon defendant told witness
Black that he had left the knife there and that "it
would betray him," meaning that it would betray wit-
ness Black.   Just after the defendant and Black had
left the house of Costly Black defendant asked witness
for some string.   Witness pulled the string out of his
pocket, which was part of a fishing line, and also gave
defendant the knife mentioned with which to cut the
string.   In this manner the knife and string came into
the possession of the defendant.   Defendant, in the
afternoon before the murder was committed, in a con-
versation with the witness Black, in which Black told
him that he was going down to his cousin Bird's to
have a game of dominos, told him that if he would
bring up his horse that he would go with him, and said
that he wanted to get some corn at Mr. Sunderhouser's,

where he had been working. Sunderhouser lived about a mile on the road from Mr. Prendergast's.

Witness Black testified that the wagon in which they rode was empty with the exception that there was a quilt and a few sacks; as to the number of sacks he could not tell, but there were at least two bran sacks which corresponded to those found in the crib filled with corn. Upon the question as to defendant traveling the road in company with Walter Black, going to and from Costly Black's and passing by the home of the deceased on the night of the murder, there seems to be no controversy. Nor does there seem to be any controversy as to the time defendant left the house of Costly Black, and the time at which defendant Walter Black testified he heard the shooting at or near the Prendergast home corresponds to the time given in evidence by other witnesses who testified in the case. It appears from the testimony that at the time the offense was committed, the defendant Walter Black was in the neighborhood or at the home of the deceased. The defendant admits that he was with Walter Black, but denies that he left him in the road at a distance of about seventy-five yards from the Prendergast home, and went across the field in a westerly direction toward the house. He admits ownership of the wagon and one of the horses and of the three sacks contained in the wagon at the time they left home, and which, as before stated, were afterward found in the corn crib. He, however, states the fact to be that witness, Walter Black, stopped the team at the point heretofore named, and went toward the house, and in a short time he heard the shots fired; then Black returned, got into the wagon with him, took hold of the lines and drove rapidly toward home. Before the case was called for trial, defendant made and signed a statement to Mr. Autenrieth, which is as follows: "I started from home

about dark with Walter Black with my own rig and horse and his horse, and I went from there to uncle Costly Black's and engaged in a game of dominos. I did not know what time it was when we left there. From there we went home. I do not recognize the knife shown me by the officer. It has never been in my possession. I had my pistol with me, a number 38. I do not know whether Walter had one or not. When we were near the land opposite Mr. Hahn's, we heard two shots. I couldn't say whether there were three or not. I says to him, someone must be killing mad dogs around here, and when Mr. Rick's wagon passed us loaded with three men, and it came up the road toward the St. Charles bridge, and we went right on home, and unhooked, and I went to bed and he went home to his father's. I make this statement of my own free will, without any reward from the officer to whom I make it, and without coercion or promise of anything."

Defendant admitted making this statement, and gave as his reason therefor that it was done in order to shield witness Walter Black. An indictment against Walter Black for the same offense was read in evidence.

This evidence was amply sufficient for the conviction of defendant.

And there was no error done in admitting the witness Walter Black to testify on behalf of the State, notwithstanding he also had been indicted in another indictment for the same crime. As to the instructions given on behalf of the State, they covered murder in the first and second degrees and manslaughter in the first and third degrees; they were extremely favorable to defendant. The court, however, did not go quite so far as to give an instruction on *self-defense*, as will presently appear.

These instructions were asked on part of defendant:

"1. The jury are instructed that even if they find from the evidence that defendant was near the place where the homicide was committed, yet they can not convict defendant unless they further find that defendant is the man who fired the fatal shot.

"2. You are further instructed that if from the evidence you find and believe that the deceased, Michael Prendergast, caught the defendant in the act of stealing some corn from his crib, and that the said Michael Prendergast, with a loaded shotgun, made an assault on the defendant with the intent then and there to kill the defendant or inflict upon him some great bodily harm, and that while said assault was being made defendant shot and killed said Prendergast, then you will find the defendant not guilty."

We will not spend any time on these instructions further than to say they are not the law. The mention in the motion for a new trial about newly discovered evidence does not mention what the evidence is nor is it supported by the affidavit of either defendant or the supposed witness.

Finding no reversible error in the record we affirm the judgment.

All concur.